## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONOLITHIC POWER SYSTEMS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  23-1155 |
| | : | |
| REED SEMICONDUCTOR CORP. | : | |

| | | |
|---|---|---|
| MONOLITHIC POWER SYSTEMS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  24-165 |
| | : | |
| REED SEMICONDUCTOR CORP. | : | |

| | | |
|---|---|---|
| MONOLITHIC POWER SYSTEMS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  24-166 |
| | : | |
| NENGDA MICROELECTRICS (SHENZHEN) CO., LTD., NENGDA SEMICONDUCTOR TECHNOLOGY (SHENZHEN) CO., LTD. | : | |

## MEMORANDUM

**MURPHY, J.**                                                              **April 13, 2026**

This is a patent infringement case about power management circuitry.  Having progressed through discovery and claim construction, defendants filed summary judgment and *Daubert* motions, and plaintiff filed a *Daubert* motion of its own.  For one patent, defendants argue a technical basis for noninfringement that we suspect might be hiding another claim-construction dispute; that one is denied.  For the other patent, defendants say the plaintiff fatally disavowed claim scope during an IPR; we disagree.  Defendants also argue that plaintiff is barred from pre-suit damages because of a failure to mark, but as far as we can tell from the record, nobody ever said that there were products that had to be marked.  Finally, the Nengda defendants correctly

call out plaintiff for adducing no evidence that they committed any acts of infringement, so they are out of the case.  Reed remains.  In the *Daubert* motions, the parties attack each other's damages experts under the robust Federal Circuit law applying Rule 702(d) to reasonable royalty opinion testimony.  In the spirit of the Federal Circuit's "measure twice cut once" approach in this area, we took a hard look at the arguments presented by the parties, but in the end conclude that the experts are ready to face the jury.  This case is going to trial.

## I.    Background

In these related actions, Monolithic accuses defendants (Reed collectively, except for issues involving the Nenga defendants specifically) of infringing two U.S. patents, no. 9,041,377 and no. 9,590,608.  We construed terms of the 608 patent on January 10, 2025.  DI 180.[1]  Trial is set to begin on November 2, 2026.  The motions on the table are as follows.  Reed filed a combined motion for summary judgment and to exclude the testimony of Monolithic's damages expert, Justin Blok.  DI 334, 335.  Monolithic opposes, DI 348, and Reed filed a reply brief, DI 357.  Monolithic, for its part, filed a motion to preclude the testimony of Reed's damages expert, W. Todd Schoettelkotte.  DI 338, 339.  Reed opposes, DI 349, and Monolithic filed a reply brief, DI 358.  We held oral argument on March 11, 2026.  DI 376.  The various arguments and relevant facts will be addressed on an issue-by-issue basis below.

## II.    Standard of review for summary judgment and *Daubert*

We "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[1] Throughout this memorandum, reference will be made to the docket in the oldest case, no. 23-1155; using the docket numbers of the under-seal versions; and using the page numbers on the documents if available, or the ECF page numbering if not.

56(a).  A factual dispute is genuine and material if a reasonable jury could find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a non-infringement motion — or other motion addressed to the patent owner's case in chief — the defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation modified).  Alternatively, defendant may show that there is no genuine issue of material fact by pointing out "an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  After that, the patent owner must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified).

Turning to *Daubert*, Rule 702 requires the proponent of the expert to "demonstrate[] to the court that it is more likely than not that: . . . (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Where the challenged expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (citation modified) (quoting *Daubert*, 509 U.S. at 592).  Courts must carefully distinguish between Rule 702's threshold gatekeeping analysis and disputes over factual weight that go to a jury.  *EcoFactor, Inc. v.*

3

*Google LLC*, 137 F.4th 1333, 1338-40 (Fed. Cir. 2025) (en banc).  "The distinction is particularly important in the context of patent damages because estimating a reasonable royalty 'necessarily involves an element of approximation and uncertainty.'"  *Willis Electric Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1374 (Fed. Cir. 2026) (quoting *EcoFactor*, 137 F.4th at 1340).

### III.    Analysis

### a.    Reed's noninfringement motion for the 608 patent is denied

Reed advances two noninfringement arguments for the 608 patent, both of which are factbound.  First, as Reed puts it, the claims "require a specific sequential order of operations," namely, "that recharging the bootstrap capacitor be initiated by decreasing the output voltage of the voltage converter."  DI 335 at 17.  Reed's focus is, e.g., the final clause of claim 1:

> when the first comparing signal has the first logic state, the bootstrap refresh module is configured to decrease the output voltage of the voltage converter; and wherein when the feedback signal is smaller than the reference voltage signal, the bootstrap refresh control circuit is configured to control the high side switch and the low side switch to switch on and off based on the difference signal so as to charge the bootstrap capacitor for refreshing the bootstrap voltage signal.

608 patent, claim 1.  Reed argues that in the accused products, "recharging the bootstrap capacitor is not initiated by any decrease of the output voltage of the voltage converter."  DI 336 at 12 (statement of fact 18); DI 335 at 2-3 (discussing the same).  Monolithic disputes statement of fact 18, citing its expert Mr. Fan, who testified that in the accused products, "recharging the bootstrap capacitor will initially 'slightly pull down Vout a little bit.'"  DI 336 at 8 (citing Appx. 736-39; 746).  That sounds like enough to forestall summary judgment, but Reed adds another twist to its argument.

According to Reed, the drop in Vout is irrelevant because it comes "*after* the recharge of the bootstrap capacitor."  DI 335 at 10.  This matters, Reed says, because the claim language

4

excerpted above requires that the drop in Vout initiates the recharge.  But to make that argument

work, Reed assumes (with bracketed language) that the claimed "feedback signal" is Vout:

> the '608 Patent.  Appx.714.  Independent claim 1 and its dependent claims 2 and 6 include the
>
> following limitations:
>
> > **[W]hen the first comparing signal has the first logic state, the bootstrap refresh module is configured to decrease the output voltage of the voltage converter**; and
> > wherein when the **feedback signal** [the output voltage of the voltage converter] **is smaller than the reference voltage signal, the bootstrap refresh control circuit is configured to control the high side switch and the low side switch to switch on and off based on the difference signal** so as to charge the bootstrap capacitor for refreshing the bootstrap voltage signal.
>
> SOF ¶ 15; Appx.36 (col. 19, ll. 39-48); *see* Appx.36 (col. 19, l. 49), Appx.37 (col. 21, l. 5)

DI 335 at 8 (highlighting added).  This bracketed language is not only unexplained in the brief,

but it is also incorrect and misleading, because the claim expressly recites that the feedback

signal is a signal "*representing* the output voltage of the voltage converter."  608 patent claim 1

(emphasis added).  A signal "representing" a voltage is not the same thing as the voltage itself.

And indeed that is how Monolithic's expert analyzed the accused instrumentality.  DI 351-7 at 7.

We may conclude our analysis at that point because we do not think that Reed fairly shouldered

its burden of explaining the basis for its motion in this regard.[2]

In passing, Reed makes a second argument for noninfringement that the accused products

do not "switch the high side and low-side switches on and off to refresh the bootstrap capacity,

as is required by all of the asserted claims."  DI 335 at 20.  Monolithic's expert disagrees,

---

[2] With respect to the disputes about the presence or absence of a temporal or causal link in the last clause of the claim, while we are hardly eager to revisit claim construction, and we need not do so here, we will of course do so if it is the only way to prevent the parties from improperly disputing claim construction in front of the jury.  If that's the road we must go down, then Reed will need to take the lead on presenting supplemental claim construction briefing well in advance of trial.

testifying that Reed's own datasheets show the switching.  DI 348 at 29-30 (citing, e.g., DI 351-3 at 228:16-21).  Reed's reply is unpersuasive attorney argument, leaving resolution of this dispute to the jury.  The motion for summary judgment of noninfringement of the 608 patent is denied.

**b.    Reed's noninfringement motion for the 377 patent based on prosecution disclaimer is denied**

Reed argues that Monolithic's statements made during an IPR on the 377 patent amount to a disclaimer barring infringement of claim 18 of the 377 patent — the only claim asserted in this case.  Prosecution disclaimer attaches when "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (footnote omitted).  "When determining whether disclaimer applies, we consider the statements in the context of the entire prosecution. . . .  If the challenged statements are ambiguous or amenable to multiple reasonable interpretations, prosecution disclaimer is not established." *Tech. Properties Ltd. LLC v. Huawei Techs. Co., Ltd.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017) (citations omitted).  The doctrine serves a public notice function; once a patent owner clearly tells the Patent Office (and the world) what the invention is not, the patent owner cannot then reclaim that territory in an infringement suit either literally or under the doctrine of equivalents. *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1145-46 (Fed. Cir. 2021).  Hence, it applies to an IPR just as much as it does to original ex parte prosecution. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017).

In the IPR, Monolithic argued that a reference known as Tateishi failed to teach the "control signal" as recited in claim 18 of the 377 patent.  Appx. 677.  Monolithic distinguished Tateishi for two reasons: (1) Reed's analysis did not "track the control signal's antecedent basis"

6

and (2) even if it did, Tateishi's "two signals are not a 'control signal' as determined by the proper construction that a control signal is a logic signal with two distinct states." *Id.* According to Reed, these arguments broadly disclaimed the scope involving "the presence of logic gates/intervening logic in the signal path between the output of the flip-flop and the input of the on-time generator." DI 335 at 21. Monolithic acknowledges the presence of "intervening circuitry in the accused products." DI 348 at 13. The question is therefore: does the IPR record establish the disclaimer that Reed says it does? We decline to read the disclaimer as broadly as Reed would like.

It is true that you can disclaim more than you meant to or need to — those corollaries flow from the public notice function of the doctrine. But it is also true that ambiguities are resolved in favor of the patent owner because the standard is "clear and unmistakable." *Omega Eng'g*, 334 F.3d at 1325-26. So too, disclaiming statements cannot be extracted free of their context. *Tech. Properties*, 849 F.3d at 1357-58. Monolithic's arguments to the PTAB do not boil down to "intervening circuitry means no infringement." Rather, Monolithic pointed to intervening circuitry to establish that there were logical inconsistencies in what was said to be Tateishi's control signal — not just different signals but "different logical signals." Appx. 681; *see also* Appx. 666-67, 685-88. In contrast, the accused instrumentality is, according to Monolithic, merely a double inverter, which, again according to Monolithic, does not introduce a logical inconsistency. DI 348 at 11. Because Reed has not persuaded us that Monolithic made a clear and unmistakable disclaimer of scope embracing the accused instrumentality (as it is understood in favor of Monolithic), Reed's motion on the 377 patent is denied.

c.      **Reed's motion to limit pre-suit damages because of failure to mark is denied**

Reed asks us to limit Monolithic's pre-suit damages under 35 U.S.C. § 287. That statute

7

provides that patent owners making products covered by the asserted patents must mark their products appropriately or else damages will not commence until actual notice (e.g., filing of a complaint). *Id.* At least for purposes of Reed's motion, Monolithic concedes that it did not mark its products. DI 348 at 30-31. The only dispute is whether any Monolithic products practice any claim of either the 608 patent or the 377 patent. *Id.* And that, in turn, is a question of specificity and shifting burdens.

During discovery, Reed propounded an interrogatory seeking identification of "all MPS Covered Products," the definition of which was not provided to us. Appx. 720 (Reed did not include the definitions page of the interrogatory in the appendix). In response, Monolithic identified certain products that "embody the '608 patent" and "embody the '377 patent" without explaining what "embody" means and without, apparently, adopting whatever the definition of "MPS Covered Products" may have been. Appx. 721, 724-26, 770. Later, at the motions stage, in the first proposed undisputed fact, Reed lists several Monolithic products and asserts that Monolithic "has identified the following products as practicing" the patents. DI 336 at 5. That seems a bit presumptuous given the interrogatory record, and indeed Reed responded that the interrogatory responses spoke for themselves and that Reed did not "demonstrate a limitation-by-limitation comparison of any claim of either" patent. *Id.*

On this record, Reed argues that Monolithic failed to carry its burden of proving compliance with the marking requirement under *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1369 (Fed. Cir. 2017). We disagree because *Arctic Cat* requires Reed to make the first move: the defendant has the "burden of production to identify unmarked products that it alleges should have been marked." *Id.* Reed starts out down this road ("once *Defendants* identify unmarked products") but then incorrectly flips the burden to Monolithic

8

("MPS Practicing Products that *MPS* identified as embodying the Asserted Patents").  DI 357 at 18 (internal quotations omitted and emphasis added); *see also* DI 335 at 28 ("MPS has identified 11 MPS Practicing Products, which MPS contends practice the Asserted Patents.").  As far as we can tell, Reed never actually took the position that certain Monolithic products should have been marked, as required by *Arctic Cat*.  It might be possible to force the patent owner to make the first move using an interrogatory, but that did not happen here because Reed relies upon unstated definitions and shifting uses of the general terms "cover," "embody," or "practice."  On this record, Monolithic's argument is entirely understandable: the relevant Monolithic products embody aspects of the patents, but neither side has actually taken the position that one or more claims reads on one of those products (and therefore should have been marked).  And without that, the *Arctic Cat* burden-shifting process does not even get started.  We deny Reed's motion precluding Monolithic's pre-suit damages.

**d.    Reed's motion for judgment of noninfringement to the Nengda defendants is granted**

Reed challenges Monolithic to identify any infringing acts by the Nengda defendants.  Setting aside references to the amended complaint, which of course cannot forestall summary judgment, Monolithic's response consists of the following record citations: footnotes 30 and 170 of Mr. Blok's expert report and Monolithic's responses to statement of fact ¶¶ 43-46 and 50.  *See* DI 348 at 31; DI 376 at 69:4-21.[3]  We address each in turn.

Mr. Blok's footnote 30 states "Amended Nengda Complaint, pg. 2; www.ipgsemi.com."  DI 351-8 at 3.  That may be discarded since it is neither part of the factual record nor does it say

---

[3] Monolithic's brief refers to "DI 262 ¶¶ 43-46" but that appears to be a typographical error that should have read DI 336 instead.  We also consider statement of fact 50, which counsel referred to during oral argument.

anything about Nengda's acts.  Mr. Blok's footnote 170 states:

> I understand Nengda was selling certain Reed Accused Devices under its IPG brand.  Although Nengda did not provide any sales information in the current matter, I understand Nengda's sale of Accused Devices would be captured in the information produced by Reed identifying sales of Accused Devices.  As a result, my analysis of the Georgia-Pacific[4] Factors below is focused on Reed's sale of Accused Devices incorporating the teachings of the Patents-in-Suit.  Therefore, if the trier-of-fact determines only Reed would have been present at the hypothetical negotiation, my opinions of a reasonable royalty in this matter would remain the same.

*Id.* at 16.  Although it appears that Mr. Blok "understand[s]" that Nenga engaged in infringing acts and "understand[s]" that Nengda's sales are subsumed in Reed's data, there is no sign of where that understanding comes from or what the actual evidence of infringing acts might be.

Turning to Monolithic's responses to the statements of fact, collectively they assert that Nengda does business under the name IPG Semi and that IPG Semi has "involvement with the accused products."  DI 348 at 31.  Setting aside the rather halfhearted phrase "involvement with the accused products," the underlying record is entirely unilluminating.  Monolithic relies on a "2023 POS" spreadsheet that shows product numbers with the suffix "IPG," but the document, included at page 650 of the appendix, is far from self-explanatory, and we are left to guess how a reasonable jury could rely on that to conclude that the Nengda defendants infringed.  DI 336 ¶¶ 43-46 (citing Appx. 650).  Monolithic also relies upon "REED1155_0522868-71," but that document is not in the record.  This appears to be a situation where the evidence simply did not materialize, and by all appearances Monolithic would have been well advised to dismiss the Nengda defendants ahead of the dispositive motions deadline.  We must grant summary judgment in favor of the Nengda defendants.

---

[4] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

10

e.        **Reed's *Daubert* motion to exclude the opinions of Monolothic's damages expert Mr. Blok is denied**

Reed finds fatal flaws in Mr. Blok's opinion on both a reasonable royalty rate and on the appropriate base.

***Royalty base.*** To begin with the base, Mr. Blok's objective was to estimate how many Reed accused products enter the United States. This was not an easy task because Reed manufactures overseas and then sells to third parties also overseas. Some of Reed's products eventually find their way into the United States, but Reed says it has no idea how many. So Mr. Blok took a two-step approach. First, he limited his base to Reed's sales of accused products to three of Reed's largest U.S.-importing customers, representing 81% of Reed's world-wide sales of accused devices. Second, he reduced those sales by the fraction of these three customers' sales that go into the United States based on publicly available data.

This is not a new problem for patent lawyers and damages experts dealing with computer subcomponents made and sold abroad. Reed relies on two Federal Circuit decisions faulting analyses somewhat similar to Mr. Blok's. In *Cyntec Co. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 989-90 (Fed. Cir. 2023), the expert failed to account for imports that did not include the accused products, rendering his estimates speculative. And in *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1372 (Fed. Cir. 2013), *overruled in part on other grounds as recognized by Brumfield v. IBG LLC*, 97 F.4th 854, 871 (Fed. Cir. 2024),[5] the expert assumed that sales of phones incorporated the accused power circuits even though the underlying

---

[5] In *Brumfield*, the Court explained that the analysis from *WesternGeco L.L.C. v. ION Geophysical Corp.*, 791 F.3d 1340, 1350-51 (Fed. Cir. 2015), applies when assessing whether patent damages are properly awarded in a case based partly on conduct that occurred abroad. *Id.* at 871. It declined to "parse *Power Integrations* to identify which particular sentences are now superseded by *WesternGeco*." *Id.*

11

evidence contained no "indicia from which [the damages expert] could reasonably infer that chargers assumed to be included incorporated Fairchild's infringing power circuits." *Id.* at 1374. Reed argues that Mr. Blok made these same baseless assumptions.

We disagree. First of all, Mr. Blok's starting point was Reed's figures for sales of accused products. So at no point could Mr. Blok have accidentally included products without the accused instrumentality in his base. Second, although Mr. Blok used publicly available U.S. import percentages from the three customers, he provided sufficient reasons to opine that the import percentages for all products would be representative of the import percentages for the specific third-party products that incorporated Reed's accused products. Mr. Blok observed that the accused products are meant to serve AI datacenter market. Appx. 809. He then noted that the three customers also serve that market. He further presented data showing that the import percentages of all products from these three customers were conservative in light of the substantial U.S. AI datacenter market. *Id.* at 809-812. Contrary to Reed's supposition that Mr. Blok overestimated the extent of infringement, it is considerably more likely that Mr. Blok underestimated infringement by limiting his analysis to only three customers and by assuming that U.S. import percentages would be the same for products serving a market that is dominated by U.S. data center customers. DI 348 at 43-44. The rest is left for cross-examination.

***Reasonable royalty rate.*** Turning to the reasonable royalty rate, Mr. Blok's *Georgia-Pacific*-style analysis incorporated a 2023 settlement agreement known as the STIT agreement. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (citation omitted). In essence, the STIT

12

agreement settled a patent infringement lawsuit between Monolithic and STIT relating to two patents (different than the ones in this case) and various synchronous rectifier products. The agreement is one part of Mr. Blok's larger analysis, but a significant one. Indeed, Mr. Blok says that the STIT agreement is the "most reliable license in this record," and it reflects a 30% royalty, which is also Mr. Blok's conclusion as to a reasonable royalty in this case. Appx. 799, 806, 809-10. Mr. Blok dedicates a large fraction of his report to explaining the STIT agreement and why he finds it relevant for this case. DI 351-8 at 22-53.[6] In its motion, Reed does not attack the many specific things that Mr. Blok said about the STIT agreement, but rather attacks what he did not say and his overall decision to rely on the agreement.

Reed's arguments fall under two headings: insufficient technical comparability and insufficient economic comparability. DI 335 at 36-43. As Mr. Blok explains, and Reed agrees, these factors are important because Mr. Blok believes that the STIT agreement "appropriately apportions for all other non-patented and supporting elements of the products to be licensed under the agreement and, therefore, includes 'built-in apportionment.'" DI 351-8 at 53. There does not appear to be a dispute that this is a legitimate approach in the Rule 702(c) sense. *See, e.g.*, *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019). Rather, the dispute is about whether Mr. Blok reliably applied this accepted method to the STIT agreement and other facts under Rule 702(d).

***Rate - technical comparability.*** For technical comparability, Mr. Blok relied upon the expert report of, and conversations with, Monolithic's technical expert Mr. McAlexander. DI

---

[6] Reed included a few excerpts of the Blok report in the joint appendix, but additional portions are docketed at 351-8. Monolithic's version contains more analysis of the STIT agreement.

351-8 at 39.  Mr. Blok explained it as follows:

> According to Mr. McAlexander, the MPS / STIT Settlement Agreement involved technology he considers to be technologically comparable to the Patents-in-Suit. The Licensed Patents in the MPS / STIT Settlement Agreement (i.e., the '790 Patent and the '104 Patent) are both directed to power converters, and more specifically, synchronous rectifiers that regulate output voltage by converting an input voltage into a controlled DC output.  According to Mr. McAlexander, the Patents-in-Suit also pertain to DC-DC converters that produce a regulated DC output.  Therefore, both the Licensed Patents and the Patents-in-Suit are focused on control mechanisms for switching to regulate output voltage.  For this reason, it is Mr. McAlexander's opinion that the Licensed Patents referenced in the MPS / STIT Settlement Agreement are technologically comparable to, albeit less important and valuable than, the Patents-in-Suit.

*Id.* (footnotes citing reliance on Mr. McAlexander removed).  Mr. McAlexander's report adds

this:

> Both the '104 / '790 Patents [the patents licensed in the STIT agreement] and the Asserted Patents are directed to power converters.  The '104 and '790 Patents are both directed to synchronous rectifiers, which use switches to control an output voltage.  Synchronous rectifiers receive an input voltage and output a controlled DC voltage.  The '377 and '608 Asserted Patents, in this case, are directed to DC-DC converters and likewise output a controlled DC voltage.  Both the '104 / '790 Patents and the '377 / '608 Asserted Patents are directed towards control mechanisms to control switching to control output voltages.

> In my opinion, the functionalities and benefits provided by the technology licensed under the MPS / STIT Settlement Agreement are technologically comparable to, albeit not as important and as valuable as, those offered by the '377 and '608 Asserted Patents in this matter.

Appx. 865-66 (footnotes removed).

Reed does not challenge that the two technologies are similar in the way Mr. McAlexander explained to Mr. Blok, but argues that they erred by not addressing purported "differences" between the technologies.  DI 335 at 37-38.  In its brief, Reed does not elaborate on what these differences may be or why they may be material to Mr. McAlexander's or Mr. Blok's analyses.  But Reed's citations to the deposition transcripts seem to suggest that Reed

14

finds significant that the STIT agreement patents are mainly targeted at applications like USB wall adapters, whereas the patents in this case have at least one primary focus on servers and data centers. *Id.*; Appx. 896-897. No one — Reed, Mr. McAlexander, nor Mr. Blok — appears to have taken a written position on whether that technical difference is material in some way. Rather, Reed argues that it was incumbent on Mr. McAlexander and Mr. Blok to call out that difference (or other unstated differences) and address it. We disagree.

Rule 702 squarely places the burden on the proponent of the expert. And technical comparability of a license agreement can be a gating question for Rule 702 purposes, particularly for a license as critical as the STIT agreement was to Mr. Blok's analysis. But here, Monolithic's experts carried their burden by articulating a coherent rationale for technical comparability focused on the type of technology and common technical features. Having established that baseline, the soundness of the conclusion of technical comparability is for the jury. *Bio-Rad Laby's, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373-74 (Fed. Cir. 2020) ("The 'degree of comparability' was appropriately left for the jury to decide."). This is the only practical result. When an expert states a baseline opinion of comparability based on similarities, one is free to rationally infer that whatever differences may exist were seen as immaterial. A clever lawyer preparing for cross-examination can always think up differences to ask about — differences that a jury might find important. But why should that render the expert opinion entirely inadmissible, especially when — on this record — the differences are merely hypothesized? Jorge Luis Borges wrote of the cartographer's quest to create a perfect map that eventually led to a map of the empire whose size was that of the empire.[7] Impressively accurate,

---

[7] On Exactitude in Science, Jorge Luis Borges (1946).

15

to be sure, but as Borges observed, that vast map was useless for its intended purpose.  The pocket map is inaccurate, but purposefully and usefully so, because it is similar in ways that are meaningful.  So too here.

*Rate - economic comparability.*  Turning to economic comparability, Reed again focuses on differences, but this time provides six of them to consider.  Some of these differences bear attention because they are evident from the face of the STIT agreement.  *See EcoFactor*, 137 F.4th 1333 at 1341-42 (in a Rule 702 analysis, interpreting disputed license agreements as a matter of law).  And among the various sorts of license agreements experts might rely upon, the Federal Circuit has cast a gimlet eye on settlement agreements in particular because of the potential for economic distortion.  *See Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1384 (Fed. Cir. 2025).  But when the viable options for estimating a reasonable royalty are limited, a cautious analysis of a pertinent settlement agreement may yet pass through the gates of Rule 702.  *Id.* (observing that settlement agreements "may be used to establish reasonable royalties under certain limited circumstances, such as where the settlement agreement is the most reliable license in [the] record") (citation modified) (citing *LaserDynamics*, 694 F.3d at 77-78).  As mentioned earlier, Mr. Blok considered several agreements and concluded that the STIT agreement was the most reliable license that he had.  Appx. 799.

Included in his extensive discussion of the similarities between the STIT agreement and the hypothetical negotiation, Mr. Blok recognized and considered each of the six differences identified by Reed between the STIT agreement and the hypothetical negotiation in this case:

(1) Reed was not a party to the STIT agreement.  Mr. Blok discussed the circumstances of STIT and its third-party manufacturer throughout his analysis.  Appx. 797-806 (e.g., "[t]he parties to the MPS / STIT Settlement Agreement were not direct

16

competitors and instead would have represented an inventor / promoter relationship" and explaining the effect of that observation, Appx. 800).

(2) The STIT agreement settled a litigation.  Mr. Blok took that into account, Appx. 800, but nonetheless concluded that the agreement was the most reliable license in the record, Appx. 799.

(3) The STIT agreement licensed sales including Monolithic trade secrets.  Mr. Blok considered that the hypothetical negotiation would be a bare license, not including trade secrets, yet the STIT agreement also settled the trade secret claims in that litigation.  DI 351-8 at 21, 37-38.

(4) STIT agreed to halt sales and imports covered by the license, which means the license could have had very little real value to the parties insofar as it set a forward-running royalty rate.  Mr. Blok discussed this aspect of the STIT agreement, explaining that the sales cessation would conditionally remain in effect and that STIT could sell off its inventory subject to the royalty.  DI 351-8 at 38-39.

(5) STIT would have lacked useful knowledge about the underlying licensed technology because it came from a third party.  But Mr. Block opined that the STIT agreement licensed products that were the smallest saleable practicing unit similar to the accused devices, and recognized that the agreement acknowledged that both parties had independent counsel.  Appx. 805.

(6) The product markets are different as mentioned above when discussing the technical differences.  As discussed already, Mr. Blok relied on Mr. McAlexander to help him conclude that "the indication of value provided by [the STIT] agreement is appropriately focused on only the economic value of the technologies comparable to

17

the Patents-in-Suit (albeit less technologically important and valuable) conveyed by the hypothetic license." Appx 805-06.

Reed does not agree with Mr. Blok's treatment of these six differences, and argues that Mr. Blok owed a more detailed explanation of that treatment.  Reed is correct that a damages expert is obliged not merely to recognize facts that influence his opinion, but to explain how, if at all, they influence his opinion.  *Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1350 (Fed. Cir. 2018).  But here, Mr. Blok explained which aspects of the STIT agreement he found influential, explained why he concluded that he would rely on it as a starting point, and then completed his *Georgia-Pacific* analysis from there.  Reed does not persuade us that Mr. Blok's approach exceeds the guardrails of Rule 702(d); Reed's criticisms are for the jury.  *See Bio-Rad Laby's, Inc*, 967 F.3d at 1373-74.

### f.    Monolithic's *Daubert* motion to strike or limit the testimony of Reed's damages expert Mr. Schoettelkotte is denied

Monolithic launches an attack of its own on Reed's damages expect, Mr. Schoettelkotte. Monolithic's arguments break down into one criticism of Mr. Schoettelkotte's rate opinion, and three about his base opinion.  DI 376 at 122-23.

***Reasonable royalty rate.***  Starting with the rate, Monolithic argues that Mr. Schoettelkotte's analysis is fatally flawed because it improperly relies on profit data from after the time of first infringement to lower the rate.  In this case, the hypothetical negotiation would have occurred around December 2021, the time of first alleged infringement.  Mr. Shoettelkotte lowers his proposed royalty rate in part because of Reed's post-hypothetical-negotiation profits in 2022 through 2025.  The difference is material because from 2021 to 2025, Reed's relevant profit margins dropped by around half.  Monolithic argues that although damages experts

sometimes may consult the "book of wisdom," a defendant's expert should be barred from doing so to reduce the measure of damages.  DI 339 at 8-9.

Almost a century ago, the Supreme Court considered the question of how to value a patent in the context of a breach of contract dispute — the value of the patent was a measure of expectation damages.  *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697-99 (1933).  The Supreme Court held that "[t]he use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach."  *Id.* at 697.  The Court observed that if the appraisal occurs soon after the patent issues, then "the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense."  *Id.* at 698.  "But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within."  *Id.*  The Federal Circuit has incorporated this concept into the reasonable-royalty analysis for patent infringement.  *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (collecting cases).

This is not to say that (i) valuing a patent for purposes of measuring the damages of not assigning that patent to a contract partner should be quite the same as (ii) determining a reasonable royalty for the use made of the invention by a patent infringer.  *Sinclair*, 289 U.S. at 699 ("Formulas of measurement declared alio intuitu may be misleading if wrested from their setting and applied to new conditions.") (citation omitted).  Rather, *Sinclair* offers an evidentiary principle about how to gain insight into a difficult problem of retrospective prognostication.  And it stands to reason that a reasonable-royalty damages analysis may incorporate evidence from

19

after the date of first infringement, because the statutory mandate is to assess a reasonable royalty "for the use made of the invention by the infringer." 35 U.S.C. § 284. For example, in a running royalty analysis, the royalty base derives from the actual sales of the accused instrumentality — as it is in this case. *See Lucent*, 580 F.3d at 1326. And Monolithic acknowledges that the Federal Circuit accepts the use of post-first-infringement evidence consistent with *Georgia-Pacific* factor 11, "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia–Pacific*, 318 F. Supp. at 1120. As the Federal Circuit explained in *Lucent*, "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers. Nor could they since frequency of expected use and predicted value are related." *Lucent*, 580 F.3d at 1333.

The same logic applies to considering the profits made by the infringer after the time of first infringement. Obviously, the prospects for profit play a role in the hypothetical negotiation. *Id.* at 1335 (discussing *Georgia-Pacific* factor 8). And "[w]hat an infringer's profits actually turned out to have been during the infringement period may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits." *Aqua Shield v. Inter Pool Cover*, 774 F.3d 766, 770 (Fed. Cir. 2014); *see also Trans– World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) ("Evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits."). Experts must handle this evidence with care, because it would be error to treat the infringer's profits "actually earned during the period of infringement as a royalty cap." *Aqua Shield*, 774 F.3d at 772; *see also Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1577 (Fed. Cir. 1988), *overturned on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v.*

20

*Dana Corp.*, 383 F.3d 1337, 1343-44, 1347 (Fed. Cir. 2004) (en banc).[8]  Similarly an expert should not "replace[] the inquiry into the parties' anticipation of what profits would be earned if a royalty (of amounts being negotiated) were to be paid with an inquiry into what profits were earned when [the infringer] was charging prices without accounting for any royalty." *Aqua Shield*, 774 F.3d at 772.

Monolithic says Mr. Schoettelkotte was not allowed to rely on Reed's profits after the time of first infringement because the book of wisdom is accessible only to plaintiffs using it to prevent an unjust underestimation of the rate.  *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465-66 (D. Del. 2005); *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 408-410 (S.D.N.Y. 2015).  Judge Nathan sensibly explained the logic motivating Monolithic's view, which "emphasizes that post-infringement information is at its most relevant when the infringer experienced a windfall as a result of their misconduct.  Comparatively, it is less relevant when it is being presented by the infringer to emphasize the lack of damages caused by their own infringement." *On Track*, 106 F. Supp. 3d at 410.  We entirely agree.  But neither *Honeywell* nor *On Track* actually announced a bright-line rule (and the Federal Circuit certainly has not either).  Rather, they urged caution for the reasons explained above, and carefully considered the evidence at issue.  We agree with that flexible approach focused on the facts of the individual case.

Turning to Mr. Schoettelkotte's use of Reed's dropping profits during the years of Reed's alleged ongoing infringement, the caselaw urges us to ask "why?"  Here, the answer appears to

---

[8] In *Fromson*, the Federal Circuit overturned the district court's reasonable royalty analysis because it "not indicate its reasons for disregarding the testimony and documents indicating Western's predictions of high profits and prices or for resolving the direct conflict in testimony of a single witness (Western's president Harrell) on profits."

21

be that there was not a good alternative.  Neither side makes reference to any available profit projections (often, the debate is about whether to rely on pre-date projections or post-date actual data).  Monolithic's Mr. Blok had no need to consider Reed's profits.  Mr. Schoettelkotte sought to consider Reed's profits and averaged several years of the available profit data.  Monolithic says Mr. Schoettelkotte should have simply used the first available profit data after infringement began to the exclusion of any later data.  That approach seems to offer the advantage of temporal proximity to the hypothetical negotiation, but it could also be viewed as unwarranted cherry-picking.  Absent other context — which Monolithic did not provide us — we cannot say that Mr. Schoettelkotte's approach violates the principles of *Aqua Products* and other cases urging caution when considering post-infringement profits.

*Reasonable royalty base.*  Monolithic argues that Mr. Schoettelkotte's opinions must be excluded for three additional reasons: he (1) incorrectly deducted incremental costs; (2) should not have used "POS Claim" data to offset Reed's revenue and profits; and (3) had no reason to conclude that the parties would split incremental profits evenly.  DI 339 at 11-22.  The first two criticisms warrant little discussion; we agree with Reed that they are fact bound and for the jury. The third has foundation in the law.  An expert may not rely on a 50/50 split of profits "without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand."  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014).  Here, Mr. Schoettelkotte's opinion is the product of a consideration of a variety of information he deemed relevant to deciding the parties' relative bargaining positions.  DI 340-1 at 23-26.  Unlike blind reliance on a principle or rule of thumb, Mr. Schoettelkotte's analysis is susceptible to cross-examination, which is the correct way to test it.

22

## IV.    Conclusion

We dispose of the cross motions as follows:

- Reed's motion for summary judgment of no infringement of the 608 patent is denied;

- Reed's motion for summary judgment of no infringement of the 377 patent is denied;

- Reed's motion to limit presuit damages because of failure to mark is denied;

- Reed's motion for summary judgment of no infringement by the Nengda defendants is granted;

- Reed's motion to exclude Monolithic's damages expert, Justin Blok, is denied; and

- Monolithic's motion to exclude Reed's damage expert, W. Todd Schoettelkotte, is denied.